The opinion of the court was delivered by
Duncan, J.
This cause was tried before me at Nisi Prim in November, last.
It was trespass vi et armis, for entering the defendants dwelling house, distressing his family, and interrupting his business, and for ejecting him from his dwelling house. The defendant justified, unde'f two executions on the same judgmentobtained by the commonwealth, a fi. fa. and ca. sa. returnable to December, 1819, against Peter Kuhn, William Gill, and Peter A. Canonge. These writs were in the hands of John Snyder, bailiff of Caleb North, one of the defendants, and on the 1st December, 1819, the amount of debt, interest and costs came to his hands, and he indorsed on that day on the ca. sa., debt, interest and costs paid, so answers John Snyder, and on they?, fa. The attorney for the commonwealth, P. A. Browne, on the 2d December, addressed a note to the sheriff, stating the amount received through him, from Mr. Frenaye, anotherof the defendants, had been received by mistake, as, was stated, and desiring the sheriff to return the money to Mr. Frenaye. *405 The indorsement on the executions, after this, was obliterated, and the executions put into Conrad Hester, the other defendant’s hands to execute. Hester on the 4th, the executions being returnable on the 6th, went to the defendant’s dwelling house, and inquired for him, of his son and was informed he was down on the wharf. The son asked his business; he was told he had a letter for him. The son said no, it was an execution he had against his father, he knew; that the debt was paid, and desired him to call again when his father would be in. In the mean time the son went to the sheriff’s office and found there were executions out in this case against his father; he informed hisfatherof it, and desired him to keep out of the way. He did so; the plaintiff wentfirsttohisson’shouse,from thatto Mr.Petries’s and staid thereall day. The son had made arrangements to have the plaintifftaken to Captain Dotoers’s but the father about 12 o’clock that night, crossed over into the Jersey, where heremained three days. The officer Hester, called a second time,and a third time about 3 o’clock. He entered into the house of Peter Kuhn, with an attendant, for the purpose of taking care of any goods, he might levy on. Miss Kuhn, the daughter of the plaintiff, was informed by the officer of his errand and his design to levy on the furniture: she said it was her’s, she had a bill of sale from her father. He said if she would show that he would not levy. She went up stairs to search for this paper,and returned saying, she had lost the key and could not find it. The officer said he must leave his attendant in the house that night to take care of the goods. She remonstrated, and Hester then said to her, pledge me your word that the goods shall be forthcoming to-morrow, and he will leave the house. The officer and his attendant departed, and nothing further was done with either writ: they were both returned some days after the return day unexecuted.
Hester afterwards confessed to G. Kuhn, the son of the plaintiff that he had made the levy.
It was alleged by the defendants that this payment and indorsement on the executions was a mistake of Mr. Browne and the sheriff’s officer: that Frenaye paid the money, with a view to purchase the judgment, and that when paid to Mr. Browne, it was agreed, that satisfaction should not be entered, but the judgment assigned to him. Mr. Randall, the attorney of Frenaye, testified that the money was received by Mr. Browne on this agreement and understanding; that on finding the mistake of the sheriff’s officer, he had the mistake rectified on the 2d, the judgment assigned to Mr. Frenaye, and then gave his order as attorney for Frenaye to the sheriff, to proceed against Kuhn. Mr. Browne did not recollect the transaction in the precise manner stated by Mr. Randall, but was satisfied he did not intend to change the state of the parties, or give to one an advantage over the other, and he knew there was a dispute between Gill, Canonge 4* Co. and Kuhn, who ought to pay this debt. There was nothing in the conduct of Mr. Browne *406 ar of Mr. Randall in any way impeachable. Mr. Randall, acting under the impression that Gill and Ganonge, were only sureties and Mr. Browne willing to take the debt from any hand, but not desiring or designing to do an act that would alter the state of the ■parties. Mr. Broione testified that he never would have received the money except on an assurance that it should be immediately paid back to him. This evidence would have left the fact in dubio, whether this was a real payment of the judgment and discharge of the execution, or an assignment to Frenaye. But the plaintiff provided with a body of written and oral testimony, which were sufficient to remove every reasonable doubt of the real transaction, whatever colour might have been intended to be put upon it by Frenaye, that it was in truth a payment by Gill, Canonge <§* Co. of which in justice and equity they ought to have paid.
The origin of the debt was thus: — Peter Kuhn, was an auctioneer appointed by the governor. His commission of auctioneer was renewed. The law required him to be bound with two sufficient securities to the commonwealth for the due discharge of his office, andón the 1st June, 1816, he gave the bond on which judgment was obtained, with William Gill, and Peter A. Canonge, as his securities, and on the 3d, William Gill, Benjamin Canonge and Peter A. Canonge, trading under the firm of Gill, Canonge $• Co. entered into articles of association with Peter Kuhn, by which Kuhn lets them into what was supposed to be a profitable concern, a concern the most profitable the governor had in his gift and which was sought after by so many and with such great anxiety, on the following terms and conditions, Gill, Ganonge £ Co. were to furnish a capital of $10,000, for the purpose of making advances on goods deposited for sale; the books to be balanced every three months; the profits from the auction and eommision business, after deductingtbe quarterly payment of duties, to be thus deducted, two-fifths to be passed to the credit of Peter Kuhn, and three-fifths to Gill, Canonge §■ Co.: the sales and entire management and direction of the fund to be confided to Gill, Canonge fy Co.: all risk and responsibility, reimbursement of advances and solidity of purchasers assumed by them. One quarters’ duties become due during this association, for which this judgment was obtained. Kuhn, failed: Gill, Canonge 8,- Co. failed. From the uature of this concern these duties came into the hands of Gill, Ganonge 8? Co. I stated to the jury that the whole might be considered as one transaction, all parts of the same, the bond and the association; and that if the duties had neither been paid to the state nor Kuhn, as they must necessarily have been received by them, then William Gill and Peter A. Canonge, could not be considered in equity in the light of securities, and on paying the debt have any right to have the security assigned to them, and that it followed if they paid ¡the money they could not call for an assignment of the judgment, and I then submitted it to the jury, whether the inference was not *407 a fair one, that giving the bond to the state with Gill, and Peter PL. Canonge, as his sureties, and the association directly after by Gill, Canonge 8,' Co. with Peter Kuhn were to be considered as simultaneous acts, parts of one whole plan; and if so, then the assignees of Gill, Canonge 8? Co. would, if there were funds in their hands, be bound to pay this debt, as in reality a debt of Gill, Canonge fy Co. due to the state. This became of some importance as connected with the evidence of G. K. Kuhn, who proved, that on the failure of Gill, Canonge 8¡- Co. who had made an assignment, which was given in evidence, to Frenaye and others, he called on Frenaye respecting the assignment, for the rent .of the store, and these duties, expressing his fathers’ great distress, as to these duties, as the non-payment would deprive his father of his office of auctioneer, and that Frenaye in the^most solemn manner declared that the duties should be paid, that he had funds sufficient in his hands to pay them; and what I placed great weight on was, that in the book of Frenaye respecting this fund, he had on the 1st December, 1819, credited himself with this amount paid P. PL. Browne,- for duties due to the commomuealth, and that this credit still remains; so that there was the fullest evidence of this pajunent.being made defacto in discharge of this debt by him as the representative of Gill, Canonge 6c Co. and so considered and so acted upon up to the time of the trial, that to me it appeared most unaccountable, that if he had bought in this judgment for himself and with his own money, that at the very instant he did it, he should credit it differently, represent it as payment of a debt due by Gill, Canonge 8¡- Co. and obtain a credit for it as money paid for them with their own money, if in truth and in fact, it had been a purchase made by him of the judgment, with his own money and on his own account; and that if it was a mistake corrected on the 2d, by the return of the fund money to him obliterating the indorsement of payment on the executions, and yet still on making dividends and striking the balance in his hands, that entry should remain unchanged, it did appear to me then, and so does now, that the jury ought to have inferred, and if they had not so inferred it, I should have been dissatisfied with, the verdict; that this was a scheme of Frenaye to try, whether he could not by taking an assignment of the debt, recover from Kuhn, and if he could not recover from Kuhn then he could be no loser as he had credit for it as the debt of Gill, Canonge 8? Co.; but that he clumsily executed this design, and the true fact was, that it was payment with -the money he held as assignee of Gill, Canonge fy Co. of a debt which he solemnlypromised to pay, which Gill, Canonge 8,' Co- ought to have paid before all other debts,- and which in every subsequent step of his account he has charged to the trust as a payment. The cause had taken up many days, and I saw an array of books on each side, and as I entertained no doubt on the questions that would arise, I stated to the counsel, that my opinion was, that if this was a purchase by Frenaye, of the judgment on *408 his own account, and the indorsement was made by mistake on the executions as a payment and discharge, the defendants were not liable in this action, they had made out their justification; that then if it was a payment made by Frenaye with the funds in his hands as assignee of Gill, Canonge fy Co. then all were trespassers, the execution was functus officio. I would still hear the counsel of both parties on it if they desired it, but it would save time not to go into the argument on the legal questions, but reserve them all for the opinion of the court in bank. This was cheerfully acquiesced in, and the public are much indebted to them for this salvation óf time. After I had delivered á charge to the effect I have stated, the counsel of the defendants reduced their points to writing on which my instruction to the jury was desired as follows, to' which 1 gave the following answers. (See the answers before stated.)
Reasons" are now assigned for a new trial. All the objections to the charge of misdirection in point of law, except the 4th are embraced in the answers to the points. The whole court agree, that in them there was no misdirection, and they agree in this; that the" verdict is not contrary to the evidence.
At first there was some apparent difference of opinion, whether the sheriff or his officer were not justified ingoing on with the execution. But on a particular examination of the evidence we have come to the same conclusion that they were not. For the money was in the hands of the officer who took it as paymrnt and indorsed it as payment, and the note from Mr. Browne to the sheriff drew it back, not because there was actual mistake, but because it was stated that there was, and the jury have negatived the fact of mistake. After having received the money and discharged the executions, the sheriff afterwards acted at his own peril, as much as if he innocently took a wrong person or goods of another, the' defendant being shown to him by the plaintiff as the real defendant.- The sheriff acts in all cases at his peril, and is answerable for any mistakes. Infinite inconvenience would arise if it were not so. Cooper and others v. Sheriff of London, 1 Burr. 33. Every case of this kind, as to liability of thé sheriff, depends strictly on the question, whether he had good authority. In an action against the sheriff, if he shows a good execution, it is sufficient for him without producing any judgment: but where against the plaintiff in the execution, he must show a judgment.
Nor is it any legal excuse for the sheriff, that the attorney for the defendant had assigned the judgment to Frenaye, and Frenaye’s attorney desired him to proceed, and that in either case whether he acted or not, he would be liable either to the plaintiff or defendant. In many cases the sheriff is exposed to this risk. But in a case like this, he might reasonably require indemnity. He takes his office subject to this peril. Better that he occasionally might incur a loss, than that the public should suffer a gene; *409 ral inconvenience, and it would be a mighty poor consolation to a man who had been illegally imprisoned, for the sheriff to say, the plaintiff’s attorney, however respectable, (and ■ none more respectable than the gentleman, who conducted this business,) told me to take you to Jail
The last reason is on account of the excessive damages; and as there was nothing of rudeness in the execution of the process, no insolence of officer, no disturbance of the plaintiff’s family, no insult to his person, no injury to his property, though Frenaye, the sheriff, and the sheriff’s officer are trespassers in entering the house, and the charge is not for the malicious and oppressive abuse of process, — not a desire to oppress, and ruin the plaintiff) for in that case as in Wilt’s case, the damages must be rank indeed that would justify a court in setting aside a verdict on that ground alone, yet here, where malice is not the gist of the action, and if it were, malice forms no ingredient in the case, and the plaintiff seeks redress only for injury done him, I cannot account for these heavy damages, except on the ground of some misconception of the jury, perhaps arising from something said in the charge, and because, though I cautioned them against intemperate damages, the jury might have conceived, from a remark by me often made, that of damages they were the sole and exclusive judges .They might have misconceived me, and supposed they might indulge an arbitrary discretion, and indeed the very feeling address of the counsel who contended adhominem, to the person of the plaintiff, must have had its influence in producing this effect.
Though I stated the law to be, that a sheriff acts at his peril, and is liable for any mistake, yet it by no means follows, that he must encounter such a peril as this, where no uncommon injury either to person or property has been sustained,'»and where his sole of-fence consists in his mistake, and not in a wanton exertion of his office, in which he has displayed no insolence of office, conducted himself to the party and the family of the party claiming redress, with all moderation and gentleness. If a sheriff is to be mulcted without any regard to these considerations in any sum a jury pleases, irremediably mulcted, then I am prepared to say, this is a peril, which the sheriff does not risk. I put a case: if the sheriff has an execution in the name of -A. against B., and Jl. shows *%im the horse of C., and says he is B’s. horse, levy on him, and the sheriff does this, in the mildest possible way, this horse is worth 100 dollars, and the jury give 1000 dollars, must this verdict stand? But further, if the sheriff is unable to pay, his sureties must, for it was decided that the sureties of a sheriff are liable in damages for an unlawful act of the sheriff in levying and selling goods of «A on an execution against B. Carmack v. The Commonwealth, 5 Binn. 184, and if a court has no power to grant a new trial, taking the conduct of the sheriff and his officer to be innocent in point of purity of motive and temperate in its manner, *410 inflicting no unnecessary injury, giving no pain which could be avoided, then the law itself would soon have an end, no man would be found mad enough to execute its sentences, and if any could from itch for office, no man could be found so insane as to jeopardize his property by becoming his security. This court cannot, on these occasions,' lay down any general rule as to granting or refusing new trials. Each case must depend on its own particular circumstances, and the question the judge generally asks hisown conscience having regard always totheprinciples of law, is, will it best subserve the due administration of justice, to grant or refuse a new trial in this case; and if there were any principle of law denying the power of the court to grant a new trial on account of excessive damages in any action of tort, I would not do it in this. But there is no such principle. If there was, it would be time to change it. Such an arbitrary power vested in any body of men, judges or jurors would he. intolerable. Lord Camden, who afterwards refused a new trial in the case of the general warrants, in 1763, in Leeman v. Allen, 2 Wils. 160, lays down the law in its true principle. He says as to the excessiveness of damages, “courts should be very cautious how they overthrow verdicts that have been given by twelve men upon their oaths: however, if the damages be unreasonable and outrageous indeed as if £2000 or £3000 were to be given in a little battery which all mankind might see to be unreasonable at first blush, certainly a court would set aside such a verdict, and try whether a second jury would not be more reasonable. The rule in the case of Ash v. Ash, Comb. 357, is a good one: that the jury arc to try causes with the assistance of the judges, and ought to give their reasons when required, that if they go upon any mistake, they may be set right. And for the not doing so, and for*excessiveness of damages a new tidal was granted, and this rule is universal, and extends to all sorts of actions. But it may be said, what rule has the court to-govern themselves by, in matters of tort? ■, I answer, the court must be able to say, the damages are beyond all measure unreasonable, though they cannot say exactly what damages are to be given.” Now here, the court say these damages are beyond all méasure unrea-. sonable. This is the doctrine of sound reason. It would be moeking the authority of this case to support it by other authorities. It contains the marrow of the law, and though it is embraced ift* very narrow limits, yet it contains the whole substance of the legal principle, conveyed in the plain and strong language of good common sense and sound law.
Nor is this authority at all marred by any subsequent opinion of this great man in the following term, in the case of the general warrants, Huckle v. Money, 2 Wils. 205. For though it must be admitted he does express himself pretty strongly on the danger of courts intermeddling in damages for torts, yet still he admits their authority to do so, but that it ought to be a glaring case of *411 outrageous damages, and what.all mankind at first blush, must think so, to induce the court to grant a new trial. This case is generally resorted to in support of verdicts for heavy damages: yet it must be remembered, that this was a great political question, in which the general liberty of the subject was involved, a daring public attack made upon the liberty of the subject by the king’s minister in which I know not what damages would be considered excessive. Besides in that case as was observed by lord Camden, the damages were swelled with the jury, because they heard the king’s counsel, and saw the solicitor of the treasury endeavouring to maintain the legality of the warrant in a tyrannical and severe manner, and the jury had done right in giving exemplary damages. To all this I agree; but at the same time the history of that day informs us that the trials put the nation in a general ferment, and then their verdicts were given flagrante ira. But the verdict all friends to just freedom must consider as a trial of liberty. But this has no relation to a mistaken opinion on a mere question of civil right, involving a mere question of law, and where most certainly, there was an absence of all evidence of design to oppress on the part of the sheriff, and his officer. So that this case is distinguishable in every feature from Sommer v. Wilt, and from Hazard v. Israel, where the entry was in the night time, the officer rude and insolent, and his whole conduct perverse and obstinate. That was a case for exemplary damages, but to give exemplary damages where the conduct of the officer was an example of moderation, and mildness, would be an ill judged example of making no distinction between oppression and humanity. In granting this new trial, it is, however, done on terms. The verdict is to remain as a security for the damages which may be found on another trial, and the action not to abate by the death of any party, or as to any party. The court do not say, that in every question of this kind, they would measure the damages, which a jury might think proper to give, in a nice balance, but making very liberal allowances in that respect, they are still bound to see that the damages do not exceed all moderation; in other words, that they are not intemperate. Such are the damages given in this case.
Rule absolute,